# UNITED STATES DISTRICT COURT

for the

Central District of California

|  |  |
|---|---|
| In the Matter of the Search of:<br>Information associated with account identified as<br>**edwinprodigy** that is within the possession, custody, or<br>control of Snap Inc. | )<br>)<br>)<br>)<br>)<br>) |

Case No. 5:21-MJ-00503

## APPLICATION FOR WARRANT PURSUANT TO 18 U.S.C. § 2703

I, a federal law enforcement officer, request a warrant pursuant to Title 18, United States Code, Section 2703, and state under penalty of perjury that I have reason to believe that within the following data:

*See Attachment A*

There are now concealed or contained the items described below:

*See Attachment B*

The basis for the search is:

☑ Evidence of a crime;
☑ Contraband, fruits of crime, or other items illegally possessed;
☐ Property designed for use, intended for use, or used in committing a crime.

The search is related to a violation of:

| *Code section(s)* | *Offense Description* |
|---|---|
| 21 U.S.C. §§ 841(a)(1), (b)(1)(C) | Distribution of Fentanyl |

The application is based on these facts:

*See attached Affidavit, which is incorporated herein by reference.*

_____
*Applicant's signature*
Magdalena DeVito, Special Agent, DEA
*Printed name and title*

Sworn to before me and signed in my presence.

Date: _____

City and State:   __Riverside, CA_____

_____
*Judge's signature*
Hon. Shashi H. Kewalramani, U.S. Magistrate Judge
*Printed name and title*

AUSA: Ruben Escalante, (951) 276-6212

**AFFIDAVIT**

I, Magdalena M. Devito, being duly sworn, declare and state as
follows:

## I.   INTRODUCTION

1.   I am a Special Agent with the United States Drug
Enforcement Administration (DEA) and have been so employed since
June 1999.  As a Special Agent with DEA, I have the ability to
conduct investigations of, and make arrests for, offenses
enumerated in Title 21, of the United States Code.  I am
currently assigned to the DEA Riverside District Office (DO)
Tactical Diversion Squad (TDS) and have been so assigned since
August 2020.  Prior to my current assignment in Riverside, I was
assigned to the DEA Bangkok Country Office, where I investigated
and conducted operations against drug traffickers in Bangkok and
around Southeast Asia.  Prior assignments to that included the
DEA Bogota Country Office and the DEA San Diego Field Division.

2.   During this time, I have investigated illicit
controlled substance trafficking in Thailand, Colombia, Mexico,
and San Diego, California.  I have attended in excess of eight
hundred hours of in-service and formal training given by various
U.S. and international law enforcement agencies covering a wide
range of controlled substances topics.  I have had formal
training and experience in controlled substance investigations
and I am familiar with the manner in which controlled
substances, including methamphetamine and cocaine, are packaged,
marketed, and consumed.

3.    I have received training in the identification of all types of controlled substances by sight and odor.  I have made in excess of 250 arrests for violations involving such substances.  In the course of my employment, I have become familiar with the ordinary meaning of controlled substance slang and jargon, and I am familiar with the manners and techniques of traffickers in illegal narcotics as practiced locally.

4.    I make this affidavit in support of an application for a warrant for information associated with the Snapchat account identified as **edwinprodigy** (the "SUBJECT ACCOUNT") that is within the possession, custody, or control of Snap Inc. (the "PROVIDER"), a provider of electronic communication and remote computing services, and a company that accepts service of legal process at 2772 Donald Douglas Loop North, Santa Monica, CA 90405, regardless of where such information is stored, held, or maintained.[1]  The information to be searched is described in Attachment A.

---

[1] Because this Court has jurisdiction over the offense(s) being investigated, it may issue the warrant to compel the PROVIDER pursuant to 18 U.S.C. §§ 2703(a), (b)(1)(A), (c)(1)(A). See 18 U.S.C. §§ 2703(a) ("A governmental entity may require the disclosure by a provider . . . pursuant to a warrant issued using the procedures described in the Federal Rules of Criminal Procedure . . . by a court of competent jurisdiction") and 2711 ("the term 'court of competent jurisdiction' includes -- (A) any district court of the United States (including a magistrate judge of such a court) or any United States court of appeals that -- (i) has jurisdiction over the offense being investigated; (ii) is in or for a district in which the provider of a wire or electronic communication service is located or in which the wire or electronic communications, records, or other information are stored; or (iii) is acting on a request for foreign assistance pursuant to section 3512 of this title").

5.    This affidavit is made in support of an application for a warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A), 2703(c)(1)(A) and 2703(d)[2] to require the PROVIDER to disclose to the government copies of the information (including the content of communications) described in Section II of Attachment B. Upon receipt of the information described in Section II of Attachment B, law enforcement agents and/or individuals assisting law enforcement and acting at their direction will review that information to locate the items described in Section III of Attachment B.  Attachments A and B are incorporated herein by reference.

6.    As described more fully below, I respectfully submit there is probable cause to believe that the information associated with the SUBJECT ACCOUNT constitutes evidence, contraband, fruits, or instrumentalities of criminal violations of 21 U.S.C. §§ 841(a)(1), (b)(1)(C) (Distribution of Fentanyl) (the "SUBJECT OFFENSES").

---

[2] The government is seeking non-content records pursuant to 18 U.S.C. § 2703(d).  To obtain the basic subscriber information, which does not contain content, the government needs only a subpoena.  See 18 U.S.C. § 2703(c)(1), (c)(2).  To obtain additional records and other information--but not content--pertaining to subscribers of an electronic communications service or remote computing service, the government must comply with the dictates of section 2703(c)(1)(B), which requires the government to supply specific and articulable facts showing that there are reasonable grounds to believe that the records or other information sought are relevant and material to an ongoing criminal investigation in order to obtain an order pursuant to 18 U.S.C. § 2703(d).  The requested warrant calls for both records containing content (see Attachment B paragraph II.10.a.) as well as subscriber records and other records and information that do not contain content (see Attachment B paragraph II.10.b.).

7.    The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from other agents and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## II.   <u>STATEMENT OF PROBABLE CAUSE</u>

8.    Based on my review of law enforcement reports, conversations with other law enforcement agents, and my own knowledge of the investigation, I am aware of the following:

9.    On May 19, 2020, the Fontana Police Department (FPD) and paramedics responded to a call that a man, identified as Pablo Lomeli Arroyo ("Arroyo"), was not breathing.  This took place at a home in Fontana, California, which is in San Bernardino County, in the Central District of California, where Arroyo lived.  When they arrived, they found Arroyo lying unresponsive on the floor in his bedroom with foam and blood coming out of his mouth.  The paramedics pronounced Arroyo dead at the scene.

10.   During this encounter, FPD officers observed a clear, small plastic baggie with green dollar signs printed on it on the desk in the bedroom of Arroyo.  The baggie contained two pills marked "M30," and next to the baggie was a half-crushed pill.  The pills were submitted for testing by the San

Bernardino County Sherriff's Department and tested positive for the presence of fentanyl, which is a Schedule II controlled substance.

11.   FPD officers also found Arroyo's cellular telephone at his home and obtained a state search warrant to search its contents, signed by Judge Kyle Brodie, Judge of the San Bernardino County Superior Court, on May 19, 2020.  Based on their review, the phone contained numerous communications between Arroyo and the Snapchat username "edwinprodigy" and phone number "909-750-1719."  LOPEZ later admitted to using that phone number.  Moreover, information provided by the Snapchat Law Enforcement Service Site to FPD regarding Snapchat account information for the time period of May 20, 2020, to May 21, 2020, shows that the ID of "edwinprodigy" was created on September 21, 2018, and is associated with phone number "909-750-1719" and the name "Edwin."

12.   The messages reflected that Arroyo ordered narcotics, including pills, from LOPEZ on more than one occasion, with the most recent purchase taking place on May 17, 2020.  For example, FPD officers found the following messages on Snapchat between Arroyo and LOPEZ:

    9-22-19, Arroyo:  Where the pills b

    10-3-19, Arroyo:  3124 Cabana Street

    11-9-19, LOPEZ:  Gram 60

    11-9-19, LOPEZ:  $50 .8

    11-9-19, LOPEZ:  .5 $30

    11-9-19, LOPEZ:  8 ball $180

11-9-19, LOPEZ:  U don't u can get .8 aha

11-16-19, Arroyo:  7743 Kempster Ave

12-11-19, LOPEZ:  [Photograph of a blue round pills with the letter M and a indecipherable number, with the caption:]  Getting percs tomorrow $25 a pill

12-31-19:  Arroyo:  Yeah but I'll meet you half way on cherry and valley

12-31-19:  Arroyo:  [link: https://www.google.com/maps/place//data=!4m2!3m1!1s0x8 0dcb4ce91282d35:0xd1bfeaf080ddf580!11m1!4b1?hl=en]

2-2-20, Arroyo:  You don't more blow?

2-5-20, LOPEZ:  If u get 20 of them I can do 10 a pop

2-5-2, LOPEZ:  11 a pop

4-12-20, Arroyo:  Pull up with 2

4-12-20, LOPEZ:  On my way!

4-15-20, Arroyo:  Fs g ima take another hour or so but ima send you $110 cuz I gave you $10 more when I sent you funds yesterday just to let you know and shit but just bag em up and get them ready I'll hit you up g

4-19-20, LOPEZ:  I'll just do $10 each if u get 10 or more pills

5-17-20:  LOPEZ:  9241 Limonite Ave Riverside, CA 92509 United States

5-17-20:  LOPEZ:  Fs lmk when u like 5 mins away

13.  Similarly, in a post-arrest interview, LOPEZ identified his Instagram account name as "edwindc1." Information provided by Facebook Law Enforcement Response Team

to FPD for the date March 20, 2020, reflected communications between "edwindc1" and "_bearface," which investigators identified as Arroyo's account based on requests for information returned to FPD.  Accordingly, FPD officers found the following messages on Instagram between Arroyo and LOPEZ.

> 3-20-20, Arroyo:  "Ohh IK where you at but I was gonna say could you deliver"
>
> 3-20-20, Arroyo:  "I'm tryna get a $60."

14.  After obtaining the state search warrant for Arroyo's cellular telephone, as set forth above, FPD performed a data extraction of Arroyo's iPhone X, telephone number 951-312-3916, for which Arroyo is listed as the subscriber, per an administrative subpoena return from AT&T.  SMS messages between Arroyo and Lopez, utilizing cellular telephone number 909-750-1719, contained messages believed to contain drug related content.  For example:

> 1-17-20, Arroyo:  "Yo it's Pablo papa"
>
> 1-17-20, Arroyo:  "When you pull up just send me a snap of you putting it inside through the passenger side window and I'll send it don't trip"
>
> 1-17-20, LOPEZ:  "Fs g to"
>
> 3-28-2020, Arroyo:  "You gonna pull up to Fontana?"
>
> 3-28-2020, Arroyo:  "Im tryna get the 2 for $35 if you still down"
>
> 3-28-2020, LOPEZ:  "Yah bro I'll go rn this foo about to pull up"
>
> 3-28-2020, Arroyo:  "Ight foo Simon"

3-28-2020, LOPEZ:  "On my way! Now"

15.  Based on a review of the messages, including a review of Snapchat, iPhone, and Instagram messages, FPD officers believed that LOPEZ was the only person who had narcotic related transactions with Arroyo and that LOPEZ met with Arroyo on May 17, 2020, to sell Arroyo narcotics.  Thereafter, FPB officers were able to identify LOPEZ from his cellular telephone number and social media account username.  FPD further identified LOPEZ through California DMV record for driver's license Y8147595 for Edwin LOPEZ with an address of 3939 Kenneth Street, Riverside 92509.

16.  On May 21, 2020, as part of the investigation, FPD initiated surveillance at 3939 Kenneth Street in Riverside, CA. FPD Officers observed a male subject matching the DMV photograph for Edwin LOPEZ come out of the residence at 3939 Kenneth Way and walk to the trunk of a black Volkswagen GTI.  An FPD officer drove by the vehicle at the time the subject was placing things in the trunk of the vehicle, and was able to confirm the subject matched the DMV photograph for LOPEZ.  The FPD officer rolled down the window of his undercover vehicle and asked the subject if his name was Edwin.  The subject answered "Yes".  Officer Martinez told LOPEZ he was looking to buy narcotics.  LOPEZ stated he could not help him at the moment.  Thereafter, FPD officers approached LOPEZ and identified themselves as officers and ordered him to stop.  LOPEZ attempted to flee.  LOPEZ ultimately surrendered to the FPD officers and was taken into

custody.  The FPD officers then secured the home, pending receipt of a search warrant.

17.  That same day, FPD officers obtained and executed a search warrant at LOPEZ's home, which included a search of the cars located at the premises, signed by Judge Kyle Brodie, Judge of the San Bernardino County Superior Court.  Among other things, FPD officers found the following in LOPEZ's bedroom: (1) a clear baggie with green dollar signs on it, with white residue; (2) a scale; (3) mail correspondence to show dominion and control of LOPEZ's bedroom; (4) ammunition; and (5) three cellular telephones.  FPD officers found another phone on LOPEZ's person.  FPD officers found over 100 blue pills marked with "M30" in a car on the premises.  LOPEZ is not the registered owner of the car in which the pills were found, but a vehicle subject query of the Treasury Enforcement Communications System (TECS), maintained by U.S. Customs and Border Protection, Department of Homeland Security showed the vehicle had been used to cross the Mexico border into the Unites States on May 2, 2020.  The car also contained his passport.  FPD officers also found scales and a cellular telephone in another car on the premises, the same car into which FPD officers saw LOPEZ putting items.

18.  On May 21, 2020, FPD Detectives interviewed LOPEZ after reading him his Miranda rights.  LOPEZ confirmed his cell phone number was 909-750-1719, which was the number associated with the Snapchat name "edwinprodigy," as set forth above. LOPEZ also said he was friends with Arroyo.  LOPEZ further

admitted to selling Arroyo 10 blue pills for $100, which he called "percs." LOPEZ admitted they were not pharmaceutical pills and that he thought they were drugs. LOPEZ also admitted to selling pills to another person and provided the address for that person.[3] FPD officers contacted that individual; that individual admitted to purchasing pills from LOPEZ and provided the remaining pills to the FPD officers. The pills were marked with "M30." The pills found in the car at LOPEZ's home, were submitted for testing by the San Bernardino County Sherriff's Department and tested positive for the presence of fentanyl.

19. I have a copy of the San Bernardino County Sherriff's Department Coroner Division's Autopsy and Toxicology report, dated June 1, 2020. In the diagnosis, among other things, it lists "Toxicology: positive 4-ANPP and caffeine, 11-hydroxy delta-9 THC 4.5 ng/mL, delta-9 carboxy THC 59 ng/mL, delta-9 THC 13 ng/ML, fentanyl 5.8 ng/mL, norfentanyl 1.4 ng/mL in femoral blood." As the cause of death, it states: "Acute fentanyl toxicity, unknown." I am informed and believe the reference to "unknown" refers to the time Arroyo ingested the substance that caused the death.

20. On approximately May 19, 2021, I sent the PROVIDER a preservation request requesting that information associated with the SUBJECT ACCOUNT be preserved for 90 days pursuant to 18 U.S.C. § 2703(f).

---

[3] During the interview, LOPEZ provided the passcode for one of his telephones. Officers accessed the device during the interview for the purpose of confirming the contact information for the individual.

21.   FPD officers obtained a state search warrant for account information associated with the SUBJECT ACCOUNT, signed by Judge Katrina West, Judge of the San Bernardino County Superior Court, on June 2, 2020.  According to the return, the PROVIDER produced a "[d]igital file of account contents."

22.   Other than what has been described herein, to my knowledge the United States has not attempted to obtain the contents of the SUBJECT ACCOUNT by other means.

### III.  BACKGROUND ON EMAIL AND SOCIAL MEDIA ACCOUNTS AND THE PROVIDER

23.   In my training and experience, I have learned that providers of email and/or social media services offer a variety of online services to the public.  Providers, like the PROVIDER, allow subscribers to obtain accounts like the SUBJECT ACCOUNT. Subscribers obtain an account by registering with the provider. During the registration process, providers generally ask their subscribers to provide certain personal identifying information when registering for an email or social media account.  Such information can include the subscriber's full name, physical address, telephone numbers and other identifiers, alternative email addresses, and, for paying subscribers, means and source of payment (including any credit or bank account number).  Some providers also maintain a record of changes that are made to the information provided in subscriber records, such as to any other email addresses or phone numbers supplied in subscriber records. In my training and experience, such information may constitute

evidence of the crimes under investigation because the information can be used to identify the user(s) of an account.

24.   Therefore, the computers of the PROVIDER are likely to contain stored electronic communications and information concerning subscribers and their use of the PROVIDER's services, such as account access information, email or message transaction information, and account application information.  In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the user(s) of a SUBJECT ACCOUNT.

25.   A subscriber of the PROVIDER can also store with the PROVIDER files in addition to emails or other messages, such as address books, contact or buddy lists, groups, social network links, calendar data, pictures or videos (other than ones attached to emails), notes, and other files, on servers maintained and/or owned by the PROVIDER.  In my training and experience, evidence of who was using an account may be found in such information.

26.   In my training and experience, email and social media providers typically retain certain transactional information about the creation and use of each account on their systems. This information can include the date on which the account was created, the length of service, records of login (i.e., session) times and durations, the types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to the account (such as

logging into the account via the provider's website), and other log files that reflect usage of the account.  In addition, email and social media providers often have records of the Internet Protocol ("IP") address used to register the account and the IP addresses associated with particular logins to the account. Because every device that connects to the Internet must use an IP address, IP address information can help to identify which computers or other devices were used to access a SUBJECT ACCOUNT.

27.  In my training and experience, email and social media account users will sometimes communicate directly with the service provider about issues relating to the account, such as technical problems, billing inquiries, or complaints from other users.  Providers of emails and social media services typically retain records about such communications, including records of contacts between the user and the provider's support services, as well records of any actions taken by the provider or user as a result of the communications.  In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the user(s) of a SUBJECT ACCOUNT.

IV.  **BACKGROUND ON THE SEIZURE OF DIGITAL EVIDENCE FROM THE PROVIDER**

28.  I know from my training and experience that the complete contents of an account may be important to establishing the actual user who has dominion and control of that account at a given time.  Accounts may be registered in false names or

screen names from anywhere in the world with little to no
verification by the service provider.  They may also be used by
multiple people.  Given the ease with which accounts may be
created under aliases, and the rarity with which law enforcement
has eyewitness testimony about a defendant's use of an account,
investigators often have to rely on circumstantial evidence to
show that an individual was the actual user of a particular
account.  Only by piecing together information contained in the
contents of an account may an investigator establish who the
actual user of an account was.  Often those pieces will come
from a time period before the account was used in the criminal
activity.  Limiting the scope of the search would, in some
instances, prevent the government from identifying the true user
of the account and, in other instances, may not provide a
defendant with sufficient information to identify other users of
the account.  Therefore, the contents of a given account,
including the email addresses or account identifiers and
messages sent to that account, often provides important evidence
regarding the actual user's dominion and control of that
account.  For the purpose of searching for content demonstrating
the actual user(s) of a SUBJECT ACCOUNT, I am requesting a
warrant requiring the PROVIDER to turn over all information
associated with a SUBJECT ACCOUNT with the date restriction
included in Attachment B for review by the search team.

29.  Relatedly, the government must be allowed to determine
whether other individuals had access to a SUBJECT ACCOUNT.  If
the government were constrained to review only a small

subsection of an account, that small subsection might give the misleading impression that only a single user had access to the account.

30.   I also know based on my training and experience that criminals discussing their criminal activity may use slang, short forms (abbreviated words or phrases such as "lol" to express "laugh out loud"), or codewords (which require entire strings or series of conversations to determine their true meaning) when discussing their crimes.  They can also discuss aspects of the crime without specifically mentioning the crime involved.  In the electronic world, it is even possible to use pictures, images and emoticons (images used to express a concept or idea such as a happy face inserted into the content of a message or the manipulation and combination of keys on the computer keyboard to convey an idea, such as the use of a colon and parenthesis :) to convey a smile or agreement) to discuss matters.  "Keyword searches" would not account for any of these possibilities, so actual review of the contents of an account by law enforcement personnel with information regarding the identified criminal activity, subject to the search procedures set forth in Attachment B, is necessary to find all relevant evidence within the account.

31.   This application seeks a warrant to search all responsive records and information under the control of the PROVIDER, which is subject to the jurisdiction of this court, regardless of where the PROVIDER has chosen to store such information.

32.  As set forth in Attachment B, I am requesting a warrant that permits the search team to keep the original production from the PROVIDER, under seal, until the investigation is completed and, if a case is brought, that case is completed through disposition, trial, appeal, or collateral proceeding.

33.  I make that request because I believe it might be impossible for a provider to authenticate information taken from a SUBJECT ACCOUNT as its business record without the original production to examine.  Even if the provider kept an original copy at the time of production (against which it could compare against the results of the search at the time of trial), the government cannot compel the provider to keep a copy for the entire pendency of the investigation and/or case.  If the original production is destroyed, it may be impossible for the provider to examine a particular document found by the search team and confirm that it was a business record of the provider taken from a SUBJECT ACCOUNT.

34.  I also know from my training and experience that many accounts are purged as part of the ordinary course of business by providers.  For example, if an account is not accessed within a specified time period, it -- and its contents -- may be deleted.  As a consequence, there is a risk that the only record of the contents of an account might be the production that a provider makes to the government, for example, if a defendant is incarcerated and does not (perhaps cannot) access his or her account.  Preserving evidence, therefore, would ensure that the

government can satisfy its Brady obligations and give the
defendant access to evidence that might be used in his or her
defense.

35.  The subscriber will also generally need to use a
password that will allow the user to gain access to the account.
Many providers do not store the password directly, rather they
use an algorithm (often referred to as a "hashing" algorithm)
that is performed on the password and generates a new random of
string of numbers and characters, which is what the provider may
store.  When a user enters his or her password, the hashing
algorithm is performed on the password before it is presented to
the provider, and the provider will verify the hash value for
the password (rather than the password itself) to authorize
access to the account.  As an added security feature, some
providers insert additional text before or after the password,
which additional text is referred to as "salting" the password.
The hashing algorithm is then performed on the combined password
and salt, which is the hash value that will be recognized by the
provider.  Alternatively or in addition to passwords, users may
be required to select or propose a security question, and then
provide an answer, which can be used to substitute for a
password or to retrieve or reset a user's password.

36.  I know based on my training and experience that
providers of email or social media services generally have
access to and store the web or Internet browsing history of the
user while he or she is logged into an account.  That history
can include the names and specific websites or URLs/URIs

(Uniform Resource Locators or Indicators) of the sites that have been visited.

37.   Providers of similar services will often keep track of what is referred to as user agent string, which contains information about the type of computer, operating system, and web browser used to access the service.  User agent string can include:  web requests or HTTP requests (hypertext transfer protocol is the protocol by which many web pages are transmitted between servers and clients or users); logs containing information such as the requestor's IP address, identity and user ID, date and timestamp, request URL or URI (Uniform Resource Locator or Indicator, i.e., a website address), HTTP protocol version, referrer, and similar information; login tracker logs; account management logs; and any other email or social media accounts accessed by or analytics related to the SUBJECT ACCOUNT.  These can be used to determine the types of devices used while accessing the SUBJECT ACCOUNT, as well as data related to the user's activity while accessing the SUBJECT ACCOUNT.

38.   I have also learned that providers of social media and e-mail services often track the behavior and activities of persons using accounts by using cookies, which are strings of characters and numbers stored on a person's computer on their web browser.  These cookies can often show whether more than one account was accessed by the same computer (and specifically the same web browser), as the provider can recognize that cookie

when the same device returns to the service to access an
account.

39.  In order to identify other accounts used or maintained
by the user of the SUBJECT ACCOUNT, the warrant also calls for
the PROVIDER to disclose both (1) any cookies associated with
the SUBJECT ACCOUNT, i.e., those cookies that were placed on any
computers or web browsers (for example, Internet Explorer or
Google Chrome) used to access the SUBJECT ACCOUNT, and (2) the
identity of any other account in which the same cookie or
cookies used to access the SUBJECT ACCOUNT was/were recognized.
If in the course of the investigation the digital devices used
by the subject(s) of the investigation are found, they can be
searched to determine if the cookies recognized by the provider
are stored on those devices.  The warrant also calls for the
PROVIDER to identify any other accounts accessed by any computer
or web browser using the same cookies as the SUBJECT ACCOUNT by
providing subscriber records and log-in information for those
other accounts (but not to provide the contents of
communications in those other accounts).

40.  Users of accounts are often required to include an e-
mail account as well as a phone number in subscriber records.
The e-mail account may be an e-mail account hosted at the same
provider, or an account at a different provider.  The e-mail
account is referred to by a number of names, such as a secondary
e-mail account, a recovery e-mail account, or an alternative e-
mail account or communication channel.  That e-mail account is
often used when the identity of the user of the primary account

19

(here, the SUBJECT ACCOUNT) needs to be verified, for example if a password is forgotten, so that the provider can confirm that the person trying to access the account is the authorized user of the account.  Similarly, the telephone number used in subscriber records is often used to send a passcode via text (or "SMS") that must be presented when trying to gain access to an account, either in a similar scenario where a user forgot his or her password, or when users implement what is referred to as "two-factor authentication" (where the password is one factor, and the passcode sent via text message to a mobile device is a second).  In either scenario, the user of a primary e-mail account (the SUBJECT ACCOUNT) and a secondary e-mail account or phone number listed in subscriber records are very often the same person, or at least are close and trusted and/or working in concert.  That is because access to either the secondary e-mail account or to the phone number listed in subscriber records can allow access to the primary account.

41.  In my training and experience, providers also keep a record of search queries run by the user of the account, whether searches within the services of the provider for persons, content, or other accounts (such as if a user is trying to find the account of an acquaintance), or broader Internet searches. In some instances, providers may also keep records of which websites or contents were "clicked on" as a result of these searches.  This information is helpful in the context of the case to show the topics about which the user was trying to obtain more information or conduct research, and is relevant for

"user attribution" evidence, analogous to the search for
"indicia of occupancy" while executing a search warrant at a
residence.

42. Providers also frequently obtain information about the
types of devices that are used to access accounts like the
SUBJECT ACCOUNT.  Those devices can be laptop or desktop
computers, cellular phones, tablet computers, or other devices.
Individual computers or devices are identified by a number of
different means, some of which are assigned to a particular
device by a manufacturer and connected to the "hardware" or the
physical device, some are assigned by a cellular telephone
carrier to a particular account using cellular data or voice
services, and some are actually assigned by the provider to keep
track of the devices using its services.  Those device
identifiers include Android IDs, Advertising IDs, unique
application numbers, hardware models, operating system versions,
unique device identifiers, Global Unique Identifiers or "GUIDs,"
serial numbers, mobile network information, phone numbers,
device serial numbers, Media Access Control ("MAC") addresses,
Electronic Serial Numbers ("ESN"), Mobile Electronic Identity
Numbers ("MEIN"), Mobile Equipment Identifiers ("MEID"), Mobile
Identification Numbers ("MIN"), Subscriber Identity Modules
("SIM"), Mobile Subscriber Integrated Services Digital Network
Numbers ("MSISDN"), International Mobile Subscriber Identifiers
("IMSI"), or International Mobile Equipment Identities ("IMEI").
Apple, one of the primary suppliers of mobile devices used to
access accounts like the SUBJECT ACCOUNT, had previously used an

identifier that was unique to the hardware of its devices, such that details of a device's activity obtained from a particular application or "app" could be used to target advertisements for the user of that device.  Apple replaced that hardware-based identifier with the Apple advertiser ID or IDFA that is still unique to a particular device, but which can be wiped and re-generated anew by a user if a user chooses to do so.  Most users, however, do not know that the IDFA exists, and therefore are unaware that their device's activity can be correlated across different apps or services.  Google uses a similar advertiser ID referred to as an AAID.

43.  These device identifiers can then be used (a) to identify accounts accessed at other providers by that same device, and (b) to determine whether any physical devices found in the course of the investigation were the ones used to access the SUBJECT ACCOUNT.  The requested warrant therefore asks for the device identifiers, as well as the identity of any other account accessed by a device with the same identifier.

44.  Providers of social media and e-mail often maintain, have access to, and store information related to the location of the users of accounts they service.  That information may be obtained by the provider in a number of ways.  For example, a user may access the provider's services by running an application on the user's phone or mobile device, which application has access to the location information residing on the phone or mobile device, such as Global Positioning System (GPS) information.  It may also be accessible through "check-in"

features that some providers offer that allow users to transmit
or display their location to their "friends" or "acquaintances"
via the provider.

**VI.   <u>SERVICSE PROVIDED AND DATA MAINTAINED BY SNAP INC.</u>**

45.  Based on a review of information provided by Snap
Inc., the PROVIDER, regarding its services and data retention
policies, information provided by other law enforcement, and/or
my training and experience, I am aware of the information
contained in this section of the affidavit regarding Snapchat.

46.  Snap Inc. owns and operates a free-access social
networking mobile application under the name of Snapchat be
accessed by downloading a Snapchat application onto cellphones.
Snapchat allows its users to establish accounts with Snapchat,
and users can then use their accounts to share messages with
each other in written forms, photographs, videos, and other
information with other Snapchat users.

47.  Snapchat asks users to provide basic contact and
personal identifying information to Snap Inc., either during the
registration process or thereafter.  This subscriber information
may include the user's full name, any alternate names such as a
maiden name or nickname, birth date, gender, contact e-mail
addresses (including deleted addresses), Snapchat passwords,
Snapchat two-factor authentication (for password retrieval and
security), telephone numbers, display names, payment
information, and other personal identifiers.

48.  The following is an overview of how the Snapchat
application (or "app") works:

a.    "Snaps" are photos or videos taken using the
Snapchat application's camera on an individual's mobile device,
and may be shared directly with the user's friends, or in a
Story or Chat (both explained below).  Snap Inc.'s servers are
designed to automatically delete a Snap after it has been opened
by all intended recipients.  Snap Inc.'s servers are designed to
automatically delete an unopened Snap sent directly to a
recipient after 30 days and an unopened Snap in Group Chat after
24 hours.

b.    "Stories": A user can add Snaps to their
"Story.".  A Story is a collection of Snaps displayed in
chronological order.  Users can manage their privacy settings so
that their Story can be viewed by all users of Snapchat, only
their friends (individuals with whom the user is directly
connected on Snapchat), or a customized audience.  A user can
also submit their Snaps to Snapchat's crowd-sourced service "Our
Story," which enables the Snaps to be viewed by all
"Snapchatters."  Snap Inc.'s servers are designed to
automatically delete a Snap in a user's Story 24 hours after the
user posts the Snap, but the user may delete part or all of the
Story before the 24 hours expire.  Submissions to "Our Story"
may be saved for longer periods of time.

c.    "Memories" is Snapchat's cloud-storage service.
Users can save their sent or unsent Snaps, posted Stories, and
photos and videos from their phone's photo gallery in Memories.
Content saved in Memories is backed up by Snap and may remain in
Memories until deleted by the user.  Users may encrypt their

content in Memories (called "My Eyes Only"), in which case the content is not accessible to Snap Inc. and cannot be decrypted by Snap.

        d.    "Chat":  A user can type messages, send Snaps, audio notes, and video notes to friends within the Snapchat app using the "Chat" feature.  Snap Inc.'s servers are designed to automatically delete one-to-one chats once the recipient has opened the message and both the sender and recipient have left the chat screen, depending on the user's chat settings.  Snap Inc.'s servers are designed to automatically delete unopened one-to-one chats in 30 days.  Users can also chat in groups. Chats sent in groups are deleted after 24 hours whether they are opened or not.  A user can save a message in Chat by pressing and holding the message.  The user can "unsave" the message by pressing and holding it again.  This will delete it from Snap Inc.'s servers.  Users can also delete chats that they have sent to a recipient before the recipient has opened the chat or after the recipient has saved the chat.

        e.    "Location Data": If a user has device-level location services turned on and has opted into location services on Snapchat, Snap Inc. collects location data at various points during the user's use of Snapchat, and retention periods for location data vary depending on the purpose of the collection. Users have some control over the deletion of their location data in the application settings.

    49.  Snapchat allows users to upload photos and videos, which may include metadata that can indicate, for example, the

user's location when s/he captured or uploaded the photo or video, and the date and time the image was captured or uploaded. It also provides users the ability to place a caption on the image and add additional images, sounds, words, and filters to the image to alter the content of the original image.

50. Snapchat users can exchange private messages on Snapchat with other users using the Chat function. These messages are sent to the recipient's "Chat" section on Snapchat, which also stores copies of messages sent by the recipient, as well as other information. Snapchat users can also post comments on the Snaps (through "Snapback") and Stories. Such comments are typically associated with the specific Snap or Story to which the commenter is responding.

51. If a Snapchat user does not want to interact with another user on Snapchat, the first user can "block" the second user from seeing his or her account.

52. Snapchat has a search function that enables its users to search Snapchat for keywords, usernames, or various activities available on Snapchat, among other things.

53. Snapchat also has a "Snap Store" feature, which allows users to purchase both tangible and virtual goods.

54. Snap Inc. has announced that it honors formal requests from law enforcement to preserve information in accordance with 18 U.S.C. § 2703(f). Upon receiving a signed and dated preservation request on law enforcement department letterhead, Snap Inc. will attempt to preserve available Snapchat account records associated with any properly identified Snapchat user(s)

in an offline file for up to 90 days, and will extend the preservation for one additional 90-day period with a formal extension request.

55.  As noted above, on approximately May 19, 2021, I sent the PROVIDER a preservation request requesting that information associated with the SUBJECT ACCOUNT be preserved for 90 days pursuant to 18 U.S.C. § 2703(f).

56.  As explained herein, information stored in connection with a Snapchat account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion.  In my training and experience, a Snapchat user's Snaps, Stories, Chats, stored electronic communications, and other data retained by Snapchat can indicate who has used or controlled the Snapchat account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.  For example, profile contact information, private messaging logs, status updates, and photos and videos (and the data associated with the foregoing, such as date and time) may be evidence of who used or controlled the Snapchat account at a relevant time.

57.  Further, Snapchat account activity, including the Location Data, can show how, when, and where the account was accessed or used.  By determining the physical location associated with the account usage, investigators can understand

the chronological and geographic context of the account access and use relating to the crime under investigation.  Such information allows investigators to understand the geographic and chronological context of Snapchat access, use, and events relating to the crime under investigation.  This geographic and timeline information may tend to either inculpate or exculpate the Snapchat account owner.

58.  Last, Snapchat account activity may provide relevant insight into the Snapchat account owner's state of mind as it relates to the SUBJECT OFFENSES.  For example, information on the Snapchat account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

59.  Therefore, the computers of Snapchat are likely to contain all the material described above, including stored electronic communications and information concerning subscribers and their use of Snapchat, such as account access information, transaction information, and other account information that are relevant to the investigation into the SUBJECT OFFENSES believed to have been committed by LOPEZ using the SUBJECT ACCOUNT.

**V.   CONCLUSION**

60.  Based on the foregoing, I request that the Court issue the requested warrant.  The government will execute this warrant by serving the warrant on the PROVIDER.  Because the warrant will be served on the PROVIDER, which will then compile the

requested records at a time convenient to it, reasonable cause

exists to permit the execution of the requested warrant at any

time in the day or night.


Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this _____ day of
July, 2020.


_____
UNITED STATES MAGISTRATE JUDGE

## **ATTACHMENT A**

This warrant applies to information associated with the SUBJECT ACCOUNT identified as **edwinprodigy** (the "SUBJECT ACCOUNT") that is within the possession, custody, or control of Snap Inc. (the "PROVIDER"), a company that accepts service of legal process at 2772 Donald Douglas Loop North, Santa Monica, CA 90405, regardless of where such information is stored, held, or maintained.

**ATTACHMENT B**

**ITEMS TO BE SEIZED**

## I. SEARCH PROCEDURES

1.    The warrant will be presented to personnel of SNAP INC. (the "PROVIDER"), who will be directed to isolate the information described in Section II below.

2.    To minimize any disruption of service to third parties, the PROVIDER's employees and/or law enforcement personnel trained in the operation of computers will create an exact duplicate of the information described in Section II below.

3.    The PROVIDER's employees will provide in electronic form the exact duplicate of the information described in Section II below to the law enforcement personnel specified below in Section IV.

4.    With respect to contents of wire and electronic communications produced by the PROVIDER (hereafter, "content records," see Section II.10.a. below), law enforcement agents and/or individuals assisting law enforcement and acting at their direction (the "search team") will examine such content records pursuant to search procedures specifically designed to identify items to be seized under this warrant.  The search shall extract and seize only the specific items to be seized under this warrant (see Section III below).  The search team may use forensic examination and searching tools, such as "EnCase" and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques.  The review of the electronic data may

i

be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the investigating agency may deliver a complete copy of the seized, copied, or disclosed electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

5.  The search team will not seize contraband or evidence relating to other crimes outside the scope of the items to be seized without first obtaining a further warrant to search for and seize such contraband or evidence.

6.  The search team will complete its search of the content records as soon as is practicable but not to exceed 120 days from the date of receipt from the PROVIDER of the response to this warrant. The government will not search the content records beyond this 120-day period without first obtaining an extension of time order from the Court.

7.  Once the search team has completed its review of the content records and created copies of the items seized pursuant to the warrant, the original production from the PROVIDER will be sealed -- and preserved by the search team for authenticity and chain of custody purposes -- until further order of the Court. Thereafter, the search team will not access the data from the sealed original production which fell outside the scope of the items to be seized absent further order of the Court.

8.    The special procedures relating to digital data found in this warrant govern only the search of digital data pursuant to the authority conferred by this warrant and do not apply to any search of digital data pursuant to any other court order.

9.    Pursuant to 18 U.S.C. § 2703(g) the presence of an agent is not required for service or execution of this warrant.

## II.    <u>INFORMATION TO BE DISCLOSED BY THE PROVIDER</u>

10.    To the extent that the information described in Attachment A is within the possession, custody, or control of the PROVIDER, regardless of whether such information is located within or outside of the United States, including any information that has been deleted but is still available to the PROVIDER, or has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), the PROVIDER is required to disclose the following information to the government for each SUBJECT ACCOUNT listed in Attachment A:

a.    All contents of all wire and electronic communications associated with the SUBJECT ACCOUNT, limited to that which occurred between September 22, 2019, and the date of this warrant,[4] including:

i.    All emails, communications, or messages of any kind associated with the SUBJECT ACCOUNT, including stored or preserved copies of messages sent to and from the account,

---

[4] To the extent it is not reasonably feasible for the PROVIDER to restrict any categories of records based on this date restriction (for example, because a date filter is not available for such data), the PROVIDER shall disclose those records in its possession at the time the warrant is served upon it.

draft messages, deleted messages, and messages maintained in trash or any other folders or tags or labels, as well as all header information associated with each email or message (including the actual IP addresses of the sender and recipients of the emails), and any related documents or attachments.

  ii. All records or other information stored by subscriber(s) of the SUBJECT ACCOUNT, including address books, contact and buddy lists, calendar data, pictures, videos, notes, texts, links, user profiles, account settings, access logs, and files.

  iii. All records pertaining to communications between the PROVIDER and any person regarding the SUBJECT ACCOUNT, including contacts with support services and records of actions taken.

  iv. All photos and videos uploaded from the SUBJECT ACCOUNT, all photos and videos uploaded by any user that have that user tagged in them, and all photos and videos commented on by the user, as well as any metadata associated therewith, including any EXIF data.

  v. All of the following information created and/or shared by, and associated with, the SUBJECT ACCOUNT: profile information; Snaps, Snapbacks, Stories, and Memories; Location Data; status updates; videos, photographs, various images (including "avatars"), and other items shared and received; records of videos, photographs, various images, and other items shared by the SUBJECT ACCOUNT and saved by other users; friend lists, including persons identified as "My

Friends," and including the friends' Snapchat user names and
display names (including those of any deleted or removed
friends); groups and networks of which the user is a member,
including any identification numbers; items purchased;
notifications and notification settings of any kind; and
information about the user's access and use of Snapchat or
third-party applications or "apps" and content shared with other
Snapchat users.

vi.  All other records of communications and
messages of any kind made or received by the user of the SUBJECT
ACCOUNT, including all private or instant messages or "Chats,"
and specifically including all attachments to any messages in
their native formats (for example, if a .zip file was sent to
another user, the .zip file shall be provided), history of
communications of any kind, and video calling history.

vii. All "Active Sessions" information and
activity logs for the account and all other documents showing
the user's posts and other Snapchat activities.

viii.    All search history and web history for
the user of the SUBJECT ACCOUNT, including records of Snapchat
searches and internet/web searches, and including web browsing
that might occur outside of Snapchat, but that Snapchat is able
to connect to the SUBJECT ACCOUNT when the SUBJECT ACCOUNT
visits websites that are using Snapchat's webpage "like"
functionality.

ix.  All information regarding clicks of, or
responses to, advertisements.

x.    Any credit card numbers provided by the user for purchases on Snapchat.

xi.   All stored passwords, including passwords stored in clear text and hash form, and for any hashed values that include a salt, the PROVIDER shall provide the salt value used to compute the stored password hash value, and any security questions and answers.

xii. All search history and web history by the user of the SUBJECT ACCOUNT.

xiii.    All web browsing activities that are identifiable with the SUBJECT ACCOUNT.

b.    All other records and information, including:

i.    All subscriber information, including the date on which the account was created, the length of service, the IP address used to register the account, the subscriber's full name(s), screen name(s), any alternate names, other account names or email addresses associated with the account, linked accounts, telephone numbers, physical addresses, and other identifying information regarding the subscriber, including any removed or changed names, email addresses, telephone numbers or physical addresses, the types of service utilized, account status, account settings, login IP addresses associated with session dates and times, as well as means and source of payment, including detailed billing records, **and including any changes made to any subscriber information** or services, including specifically changes made to secondary email accounts, phone numbers, passwords, identity or address information, or types of

services used, and including the dates on which such changes occurred, for the following accounts:

(I)  the SUBJECT ACCOUNT.

ii.  All user connection logs and transactional information of all activity relating to the SUBJECT ACCOUNT described above in Section II.10.a., including all log files, dates, times, durations, data transfer volumes, methods of connection, IP addresses, ports, routing information, dial-ups, and locations, and including specifically the specific product name or service to which the connection was made.

iii. All "check ins," "last location," and other Location Data information.

iv.  All past and present lists of friends created or accepted by the account.

v.   All privacy settings and other account settings, including privacy settings for individual Snapchat posts and activities, privacy settings that apply to certain lists of Snapchat friends and the accompanying lists, and all records showing which Snapchat users have been blocked by the account.

vi.  All information about the user's access and use of Snap Store.

vii. All information about connections between the account and third-party websites and applications.

viii.    All information related to the SUBJECT ACCOUNT's membership in any groups, including the identity of other accounts in the same group, and information identifying

any groups or organizational pages or accounts for which the
SUBJECT ACCOUNT is an administrator.

      ix.  Any push token or device token identifiers.

      x.   Any facial recognition data.

      xi.  Any and all logs of user activity and user
agent string, including:  web requests or HTTP requests; any
logs containing information such as the Requestor's IP address,
identity and user ID, date and timestamp, request URI or URL,
HTTP protocol version, referrer, and other user agent string
information; login tracker logs; account management logs; and
any other information concerning other e-mail or social media
accounts accessed by or analytics related to the SUBJECT
ACCOUNT.

      xii. Any and all cookies used by any computer or
web browser associated with the SUBJECT ACCOUNT, including the
IP addresses, dates, and times associated with the recognition
of any such cookie.

      xiii.   Any other account associated with the
cookie(s) associated with the SUBJECT ACCOUNT.

      xiv. Any other account associated with the
SUBJECT ACCOUNT, including by means of sharing a common
secondary, recovery, or alternate **e-mail address listed in
subscriber records** for the SUBJECT ACCOUNT or by means of
sharing a **common phone number or SMS number listed in subscriber
records** for the SUBJECT ACCOUNT, and any account that lists the
SUBJECT ACCOUNT as a secondary, recovery, or alternate e-mail
address.

xv.   Any information identifying the device or devices used to access the SUBJECT ACCOUNT, including any Android ID, Advertising ID, unique application number, hardware model, operating system version, unique device identifier, Global Unique Identifier or "GUID," serial number, mobile network information, phone number, device serial number, MAC address, Electronic Serial Number ("ESN"), Mobile Electronic Identity Number ("MEIN"), Mobile Equipment Identifier ("MEID"), Mobile Identification Number ("MIN"), Subscriber Identity Module ("SIM"), Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"), International Mobile Subscriber Identifier ("IMSI"), International Mobile Equipment Identity ("IMEI"), or Apple advertiser ID or ID for advertisers ("IDFA") or Google's AAID or any other advertiser ID, and any other information regarding the types of devices used to access the SUBJECT ACCOUNT or other device-specific information, including the device type, brand name, device mode or operating system, and first and last times that a device were observed.

xvi. Any other account accessed by a device with an identifier responsive to the device identifiers called for in paragraph 10.b.xi.

xvii.   Any information showing the location of the user of the SUBJECT ACCOUNT, including while sending or receiving a message using the SUBJECT ACCOUNT or accessing or logged into the SUBJECT ACCOUNT.

III. **INFORMATION TO BE SEIZED BY THE GOVERNMENT**

11.  For each SUBJECT ACCOUNT listed in Attachment A, the search team may seize:

a.   All information described above in Section II.10.a. that constitutes evidence, contraband, fruits, or instrumentalities of violations of 21 U.S.C. §§ 841(a)(1), (b)(1)(C) (Distribution of Fentanyl) (the "SUBJECT OFFENSES"), namely:

i.   Information relating to who created, accessed, or used the SUBJECT ACCOUNT, including records about their identities and whereabouts.

ii.  Information related to how and when the SUBJECT ACCOUNT was accessed or used.

iii. Information concerning the payment or transfer of money concerning the SUBJECT OFFENSES.

iv.  Information relating to the purchase, sale, distribution, possession and/or procurement of controlled substances, and the advertisement of controlled substances for sale, including audio recordings, pictures, video recordings, or still captured images related to the purchase, sale, transportation, or distribution of drugs.

v.   Information relating to the proceeds of the sale or distribution of controlled substances, including the creation and use of bank, financial and cryptocurrency accounts, and records related to cryptocurrency, bank, and wire transactions.

x

vi.   Information relating to co-conspirators engaged in the SUBJECT OFFENSES, which could include information relating to their identities, whereabouts, communications, and methods of contact and communication.

b.   All records and information described above in Section II.10.b.

## IV.   <u>PROVIDER PROCEDURES</u>

12.   IT IS ORDERED that the PROVIDER shall deliver the information set forth in Section II within 10 days of the service of this warrant.  The PROVIDER shall send such information to:

    Magdalena M. DeVito
    4470 Olivewood Avenue, Riverside, CA 92501
    951-445-6398
    Magdalena.M.DeVito@usdoj.gov

13.   IT IS FURTHER ORDERED that the PROVIDER shall provide the name and contact information for all employees who conduct the search and produce the records responsive to this warrant.